UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | No. 1:21-cr-00110-TRM-CHS |
| v. | ) | |
| | ) | |
| ROBERT JAMES DAVIS, JR., | ) | |
| *aka*, Demetric Pointer, | ) | |

## REPORT AND RECOMMENDATION

**I.  Introduction**

This matter is before the Court upon Defendant Robert James Davis Jr.'s Motion to Suppress [Doc. 24] which the District Court has referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)-(C). On the morning of January 2, 2021, police were called to a gas station where Defendant was sleeping in his car—at a gas pump, with motor running and headlights on—for more than an hour. After making contact with Defendant, a detention ensued during which Defendant was eventually arrested and his vehicle and person subsequently searched. Defendant seeks to suppress evidence found as a result of that search and statements made by Defendant during the encounter. For the reasons stated herein, it is **RECOMMENDED** that the motion to suppress be **DENIED IN PART** and **GRANTED IN PART**.

**II.  Facts**

The Court conducted an evidentiary hearing on Defendant's motion to suppress on February 14, 2022. Chattanooga Police Officer Derek Roncin was the only witness who testified at the hearing. The Court makes the following findings of fact:

- At the time of the incident, Office Roncin was wearing a body camera and his patrol car's dash camera was operating. Based on his demeanor and the consistency

between his testimony and the video evidence, the Court finds Officer Roncin to be a credible witness.

- An employee at the Circle K gas station located in Hixson, Tennessee, called police dispatch on February 14, 2022, at about 7:30 a.m., to report that a grey/black Camaro had been parked at a gas pump, with engine running and headlights on, for over an hour. The employee stated he had not gone to the Camaro to investigate.

- The dispatcher sent Officer Roncin, EMS, and the Fire Department to the scene for a possible medical emergency. Officer Roncin arrived on the scene a few minutes later, followed by a fire truck and EMS about a minute and a half later.

- Upon arrival at the gas station, Officer Roncin parked his patrol car nose-to-nose with the Camaro so that, if the driver had not put the Camaro in park and it were to move forward, the patrol car would stop it from plowing into the convenience store.

- Officer Roncin walked to the back of the vehicle to radio the license plate to dispatch. Defendant was seated in the front seat, head back, eyes closed, and motionless. He appeared unconscious.

- Officer Roncin walked to the driver's door and knocked lightly on the window. Officer Roncin was unsure whether he or Defendant opened the door and the video was not clear on this point. However, it is clear from the video that Defendant placed his hand on the door handle when the door was opened. Either or both Officer Roncin and Defendant opened the door a couple of seconds after Officer Roncin knocked on the window.

- Officer Roncin testified that the initial purpose of making contact with the driver was to check on his welfare; however, the focus of his contact expanded when the door was opened because Officer Roncin smelled marijuana and alcohol, which led him to believe that he might have a DUI situation.

- Officer Roncin asked Defendant what was going on. Defendant responded that he had fallen asleep. Defendant's eyes were bloodshot and droopy. His speech was slightly slurred. Officer Roncin asked Defendant for his name and ID, and stated that "fire and EMS" were coming to check him out. Defendant said he did not need fire and EMS. Officer Roncin asked Defendant what he'd had to drink last night. At that point, Defendant began reaching toward the console or front passenger seat and said he was looking for his "liquor bag."

- When Defendant began reaching toward the front passenger seat or console of the vehicle, it concerned Officer Roncin. Officer Roncin had sixteen years of experience as an officer with the Chattanooga Police Department ("CPD"). Based on his experience, Officer Roncin knew that, when a driver begins looking down into the passenger area or console of a vehicle during a traffic stop, the driver may be trying to conceal a weapon. Concerned that Defendant might be reaching for a

weapon, Officer Roncin told Defendant not to worry about the liquor bag and asked him if he had any guns or knives and anything else illegal on him. Defendant shook his head, "no." For his safety, Officer Roncin asked Defendant to step outside the car and put his hands on the roof of the Camaro so that he could pat him down before the ambulance arrived. Defendant asked why he had called an ambulance. Officer Roncin responded he could decline the ambulance when it arrived but he needed to step out now so that Officer Roncin could pat him down. Defendant continued to ignore Officer Roncin's directive and stated that he wanted another officer; that he didn't feel comfortable with Officer Roncin; and that Officer Roncin had made him paranoid.

- During this exchange with Officer Roncin, Defendant continued to look down to his right, causing Officer Roncin concern for his safety. Defendant then picked up his phone to make a call. At that point, Officer Roncin took one of Defendant's hands, unholstered his taser, and told him again to step out of the car—emphasizing that it was not a request.

- Defendant then exited the vehicle, and Officer Roncin placed his taser in the holster. Officer Roncin turned Defendant around to face the rear passenger window and directed Defendant to put his hands on the car. Defendant kept wriggling and inching toward the open driver's doorway. Officer Roncin continued to try and move Defendant back to the back passenger side window away from the open door while issuing instructions to Defendant to put his hands on top of the Camaro and walk his feet back. Defendant refused to stand still and would not comply with Officer Roncin's instructions to walk his feet back from the Camaro. During this encounter, Officer Roncin's actions were restrained. At about 3 minutes and 33 seconds into the bodycam video, Officer Roncin, standing completely outside the Camaro, saw through the open driver's side door a handgun wedged between the driver's seat and the console.

- When Officer Roncin saw the handgun, he said loudly that he saw a handgun which had not been disclosed by Defendant. Officer Roncin proceeded to put Defendant's hands behind his back to handcuff him, but Defendant broke away and ran behind the rear of the Camaro. Two firemen helped Officer Roncin stop and subdue Defendant.

- After subduing Defendant, Officer Roncin pulled Defendant to his feet and placed him against the trunk of the Camaro before moving him to an area next to the patrol car. There, he searched Defendant, going through his pockets and pulling out wads of cash. Defendant protested, asking "how you can do that?" Officer Roncin responded that it was because Defendant was under arrest. Defendant asked if he could call his girlfriend and count his money. Defendant then spontaneously said, "I'm going to prison." Officer Roncin asked him why he said that he was going to prison, and further asked whether Defendant was a convicted felon. Defendant first said "yes." Then he said that he was not a "convicted felon." In response, Officer

> Roncin asked again why he said he was going to prison. Defendant's response is not fully audible, but he said something about a gun.

- Defendant was placed in the back of Officer Roncin's patrol car. Seven and a half minutes elapsed from the time Officer Roncin knocked on Defendant's window to the time he placed Defendant in the patrol car.

- While Defendant was seated in the patrol car, other officers who had arrived on the scene searched the Camaro. During the search, they found, in addition to the handgun, an ammunition cartridge, a single bullet, a baggy, and scales. A check of the handgun's serial number revealed that it was stolen. Officer Roncin charged Defendant with possessing stolen property, public intoxication, possession of unlawful drug paraphernalia, resisting a lawful stop, and improper window tint on a vehicle.

### III.  Discussion

#### A.  The Search and Seizure

Defendant asserts that Officer Roncin opened Defendant's car door and detained him in violation of the Fourth Amendment. Consequently, he argues that the gun, ammunition, baggy, and scales found in the subsequent search of the vehicle are "fruit of the poisonous tree" and must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471 (1963).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "A warrantless search or seizure is 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). *See United States v. Sweeney*, 891 F.3d 232, 235 (6th Cir. 2018) (citing *California v. Carney*, 471 U.S. 386, 390) (1985)).

One exception to the warrant requirement is the community caretaker exception. *Taylor v. City of Saginaw*, 922 F.3d 328, 334-35 (6th Cir. 2019). The *Taylor* court explained the parameters of the community caretaker exception:

> This exception applies "whe[n] ... government actors [are] performing 'community-caretaker' functions rather than traditional law-enforcement functions." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). Unlike other exceptions, it requires that we "look at the function performed by a [government agent]" when a search occurs. *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (emphasis in original). To apply, this function must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L.Ed.2d 706 (1973).

*Id.*

The information provided by the Circle K clerk did not indicate that Defendant was engaged in any illegal activity. Rather, the clerk simply informed dispatch that someone had been parked by the pump, motor running, for an hour, and this information was passed on to Officer Roncin. When police dispatch conveyed the store employee's information to Officer Roncin and sent him to the Circle K, the Fire Department and EMS were also dispatched. Officer Roncin knew that the Fire Department and EMS were on the way to provide medical assistance if necessary.

Law enforcement's concern for Defendant's welfare was reasonable under the facts. Ordinarily, drivers stay at a gas pump only long enough to pump gas into their vehicles—a process that generally takes less than ten minutes. It could take longer if the driver enters the store to make a purchase, but that was not the case here. Rather, Defendant had been sitting in his car at the gas pump, with his engine running, for an hour. Such conduct raised a legitimate concern that the driver may have been incapacitated by a heart attack, stroke, drug overdose or other medical condition. This concern was heightened when Officer Roncin arrived on the scene and saw the driver in the car, head back, eyes closed, seemingly unconscious.

Notwithstanding Officer Roncin's reasonable concern for Defendant's welfare, Defendant argues that Officer Roncin's opening of the car door was an unconstitutional search because he did

not wait to see if Defendant was capable of responding to his knock on the window.[1] However, the Sixth Circuit has held in a similar case that an officer is not required to knock on a vehicle's window and wait for a response before opening the door when acting under the community caretaker exception. *See United States v. Lewis*, 869 F.3d 460 (6th Cir. 2017).

In *Lewis*, police were called to a Wal-Mart with a report that a female shopper appeared intoxicated. Police arrived on the scene and observed that the shopper appeared off-balance, was propping herself up with the shopping cart, and was nodding off. When they approached the shopper, they asked her if someone was available to drive her home. She stated that her boyfriend could do so. Officers then escorted the shopper to the parking lot to determine whether her boyfriend was available to drive her home. One of the officers looked in the driver's side window and observed the boyfriend asleep on the passenger side. Another officer, without knocking, opened the truck door. Upon opening the door, the officer saw a baggy containing a bluish substance that the officer thought might be marijuana or pills. This discovery eventually lead to a full search of the vehicle and charges related to possession of oxycodone and alprazolam. The boyfriend sought to suppress all evidence found in the truck on the basis that it was the fruit of an illegal search. The Sixth Circuit held that the community caretaker exception applied because, when the officers approached the truck: (1) the officers' sole purpose was to find the incapacitated shopper a ride home; (2) there was no evidence that "the officers' action was taken with any traditional law-enforcement purpose that would make the community care-taker exception inapplicable; and (3) "given the community-caretaking nature of the officers' action, any limited

---

[1] Even if Defendant had responded after Officer Roncin knocked, but before the door was opened, such a response would not conclusively demonstrate that Defendant was not experiencing a health emergency. A person can be seriously ill, even when awake.

intrusion on Lewis' privacy from simply opening the door was reasonable." *Id.* at 463-464. The instant case is similar in all important respects.

First, the clear purpose of the call—as demonstrated by the Fire Department and EMS being dispatched to the scene—was the welfare of the Camaro's occupant. Second, there is no evidence to suggest that Officer Roncin's action in opening the car door was taken with any traditional law enforcement purpose in mind. Third, opening the car door represents a minimal intrusion compared to the legitimate concern for Defendant's welfare. The Court concludes that Officer Roncin's action in opening the car door did not violate the Fourth Amendment.

Once the door was open and Officer Roncin smelled the odor of marijuana and alcohol, the encounter expanded beyond a welfare check and became a criminal investigation. Officer Roncin had every right to search the Camaro at that point. It is well settled in the Sixth Circuit that the smell of marijuana emanating from a vehicle provides probable cause to search it. *See United States v. Foster*, 376 F.3d 577, 583–84 (6th Cir. 2004) (officer has probable cause to search vehicle regardless of whether the officer smelled fresh or burnt marijuana); *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) (observing that "[t]his court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search"); *United States v. Garza*, 10 F.3d 1241, 1246 (1993) (probable cause existed where an officer smelled marijuana coming from a vehicle); *United States v. Avant*, 650 F. App'x 890, 892 (6th Cir. 2016) (smell of marijuana alone is sufficient to establish probable cause to search automobile); *United States v. McCaster*, 466 F. App'x 443 (6th Cir. 2011) (marijuana odor coming from a car gives rise to probable cause)

At the point that Officer Roncin smelled marijuana and alcohol emanating from the Camaro, he had probable cause to search the vehicle for alcohol and marijuana. Beyond that, he

also had reasonable suspicion to conduct a brief stop to investigate whether criminal activity was taking place. *Terry v. Ohio*, 392 U.S. 1 (1968). A police officer conducts an investigatory stop, also called a "*Terry* stop," when he or she briefly detains a person without probable cause in order to investigate a possible crime. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Lyon,* 687 F.3d 754,763-64 (6th Cir. 2012); *United States v. Bailey*, 302 F.3d 652 (6th Cir. 2002). In order to conduct an investigatory stop within constitutional boundaries, an officer must have a reasonable suspicion based on specific and articulable facts that the individual he seeks to detain is involved in criminal activity. *Terry*, 392 U.S. 1; *United States v. Arvizu*, 534 U.S. 266, 750 (2002); *Lyons*, 687 F.3d at 764. Reasonable suspicion is a "less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). "Reasonable suspicion must be considered 'under the totality of the circumstances, considering all of the information available to law enforcement officials at the time.'" *Lyons*, 687 F.3d at 763 (quoting Humphrey v. Mabry, 482 F.3d 840, 846 (6th Cir. 2007)). The government bears the burden to prove by a preponderance of the evidence that police had reasonable suspicion to make an investigative/*Terry* stop. *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008).

In addition to being justified at its outset, an investigative stop must be reasonable in its scope and duration:

> A valid *Terry* stop must be "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). To be limited in scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. To be limited in duration, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."

*United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012); *see also United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020). The odor of alcohol and marijuana emanating from the vehicle was

a specific and articulable fact which gave Officer Roncin reasonable suspicion to believe that Defendant had been driving under the influence and was in possession of marijuana, both violations of Tennessee law.

Once Officer Roncin had detained Defendant in his Camaro, he could legally ask Defendant to step out of his car. *United States v. Prigmore*, 15 F.4th 768, 778 (6th Cir. 2021) ("Law enforcement may order passengers out of the car during a traffic stop based on the 'weighty interest in officer safety' and 'minimal' intrusion on the passenger's liberty") (quoting *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997)); *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (officers "do not need an independent justification" to remove an occupant from a vehicle during a traffic stop, in part, because "traffic stops are fraught with danger for police officers") (citation cleaned up). Consequently, Officer Roncin's removal of Defendant from the vehicle did not violate constitutional standards.

During the course of the investigatory stop, Officer Roncin saw the firearm wedged between the console and the front driver's seat.[2] At that point, Officer Roncin had a reasonable basis to place Defendant in handcuffs for officer safety and the safety of those nearby. However, when Officer Roncin tried to handcuff him, Defendant used his body to push away from Officer Roncin, pulled his arms free, and attempted to escape on foot. At that point, Defendant had

---

[2] Before Officer Roncin saw the handgun, he had a constitutional basis to frisk Defendant for a weapon. An officer may conduct a frisk where the police reasonably suspect the person is armed and dangerous. *United States v. McMullin*, 739 F.3d 943, 946 (6th Cir. 2014) (citing *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009)). Defendant's continued resistance to Officer Roncin's instructions, his continued reaching toward the console, and the marijuana odor gave Officer Roncin a reasonable basis to believe Defendant may be resisting his instructions to avoid detection of illegal drugs and weapons. From that, Officer Roncin could reasonably suspect that Defendant was armed and dangerous. In any event, Officer Roncin was never able to conduct the frisk because Defendant ran away. No evidence was found as a result of the frisk.

committed a crime justifying arrest. *See* Tenn. Code Ann. § 39-16-602. More specifically, Tenn. Code Ann. § 39-16-602(a) provides,

> (a) It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

Officer Roncin subdued Defendant, placed him under arrest, and began searching his pockets where he found wads of cash. An officer may lawfully search the person of an arrestee incident to his arrest. *Arizona v. Gant*, 556 U.S. 332, 339 (2009); *United States v. Williams*, 483 F.3d 425, 430 (6th Cir. 2007). The subsequent search of the Camaro met constitutional muster because, as previously discussed, the marijuana odor emanating from the vehicle gave police probable cause to search the vehicle. Consequently, for the reasons discussed, the Court finds no basis to suppress any physical evidence found on Defendant's person or in the Camaro.

### B. Defendant's Statements

Defendant asserts that, because he was not given *Miranda* warnings at the Circle K, in violation of the Fifth Amendment, all his statements made at the scene must be suppressed.[3] The Fifth Amendment protects a person from being compelled to incriminate himself. U.S. Const. amend. V. A suspect who is subject to custodial interrogation must be given *Miranda* warnings against self-incrimination. If no *Miranda* warnings are given, then the incriminating statements elicited cannot be admitted at trial. *Dickerson v. United States*, 530 U.S. 428 (2000); *Miranda v. Arizona*, 384 U.S. 436 (1966). A person detained pursuant to a *Terry* stop is not considered to be in custody for purposes of triggering the *Miranda* requirement. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). "The very nature of a *Terry* stop means that a detainee is not free to leave

---

[3] Defendant does not identify any specific statements in his briefs that he seeks to have suppressed. He makes this suppression argument in a general manner.

during the investigation, yet is not entitled to *Miranda* rights." *Id*. (citing *Berkemer v. McCarty*, 468 U.S. 420, 439–41 (1984)); *see also United States v. McKinney*, Case No. 1:17-cr-133-CLC-SKL, 2018 WL 4266518, at *5 (E.D. Tenn. July 5, 2018) (Lee, M.J.). "[T]he obligation to administer a *Miranda* warning to a suspect only arises 'where there has been such a restriction on a person's freedom as to render him in custody.'" *Swanson*, 341 F.3d at 528 (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (per curiam)); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) ("in order for Miranda to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest.") (citing *California v. Beheler*, 463 U.S. 1121, 1125, (1983)).Whether a person is "in custody" for *Miranda* purposes is based on objective factors:

> In determining whether a person is "in custody" for purposes of Miranda, courts look to "the objective circumstances of the interrogation ... to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (internal quotation marks and citation omitted). The ultimate inquiry is whether, under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest. *Id*. If so, he is "in custody" for purposes of *Miranda*. Guiding the inquiry are four, non-exhaustive factors: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

*United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017).

Defendant was detained from the moment Officer Roncin asked him to step outside the Camaro, but he was not restrained to a level that would constitute a formal arrest. Officer Roncin did restrain Defendant's freedom of movement by directing Defendant to stand against the Camaro with his hands on the hood, and he did not advise Defendant that he could refuse to answer his questions; however, the duration of this detention was very brief. The time elapsed from Officer Roncin's knocking on the Camaro's window to Defendant being subdued on the ground was less

than three minutes. During this time, Officer Roncin's questioning was quite limited. He first addressed Defendant's welfare. Later, after Officer Roncin smelled marijuana, he questioned Defendant as to whether he had an illegal substance or weapon in the vehicle—something Defendant denied. Much of that conversation occurred while Defendant was seated in his own vehicle. Further, when Defendant was directed to step outside his vehicle for officer safety, he was not ordered to go to the patrol car. In addition, Defendant and Officer Roncin were at a gas station—not a traditional venue for custodial interrogation.

A reasonable person in Defendant's position would have understood that, during this brief period, his detention was for investigative purposes. It lacked the finality of an arrest until Defendant attempted to run away and was stopped. Only after Officer Roncin forcibly subdued Defendant and took him to the patrol car in handcuffs was Defendant under arrest. At that point, Officer Roncin actually told Defendant he was under arrest. The Court concludes that Defendant was not under arrest and not entitled to *Miranda* warnings until he was subdued on the ground by Officer Roncin with assistance from fire fighters.

Once Defendant was subdued on the ground, the *Miranda* warning requirement for custodial interrogation kicked in. Custodial interrogation is express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010)). "The 'functional equivalent' of express questioning includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Tolliver*, 594 F.3d at 917 (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990)). On the other hand, statements which are volunteered, i.e., not made in response to custodial interrogation, will not be suppressed for lack of *Miranda* warnings. *Innis*, 446 U.S. at 302-03.

After his arrest, Defendant asked several questions and voluntarily offered, without questioning, several statements including, "I'm going to prison." Defendant's volunteered statements need not be suppressed because they were not made in response to interrogation or its functional equivalent. Officer Roncin did ask Defendant why he thought he was going to prison and Defendant offered a largely inaudible response with a reference to a "gun." This response is not admissible because it was elicited by custodial questions without the benefit of *Miranda* warnings.

IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED**[4] that Defendant's Motion to Suppress be **DENIED IN PART** and **GRANTED IN PART** as follows:

1. Defendant's motion to suppress be **DENIED** as to all physical evidence seized from the search of Defendant's Camaro and his person on February 14, 2022, at the Circle K convenience store and gas station in Hixson, Tennessee.

2. Defendant's Motion to Suppress be **DENIED** as to all statements Defendant made on February 14, 2022, at the Circle K in Hixson, Tennessee, subject to the exception below.

3. Defendant's Motion to Suppress be **GRANTED** as to Defendant's response to Officer Roncin's question as to why Defendant believed he was going to prison.

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified constitutes a forfeiture of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).